**No. 22-4056, 22-4061**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

**M. S., et al.,**

Plaintiffs-Appellees,

v.

**PREMERA BLUE CROSS,**

Defendant-Appellant,

and

**MICROSOFT CORPORATION, et al.,**

Defendants.

_____

**M. S., et al.,**

Plaintiffs-Appellees,

v.

**MICROSOFT CORPORATION, et al.,**

Defendants-Appellants,

and

**PREMERA BLUE CROSS,**

Defendant.

_____

On appeal from the United States District Court for the District of Utah,
Case No. 2:19-cv-00199, District Judge Robert J. Shelby

_____

**REPLY BRIEF OF APPELLANTS PREMERA BLUE CROSS,
MICROSOFT CORPORATION, AND
MICROSOFT CORPORATION WELFARE PLAN**

_____

**ORAL ARGUMENT REQUESTED**

GWENDOLYN C. PAYTON
JOHN R. NEELEMAN
KILPATRICK TOWNSEND
    & STOCKTON LLP
1420 5th Avenue, Suite 3700
Seattle, Washington 98101
Telephone: (206) 467-9600
gpayton@kilpatricktownsend.com
jneeleman@kilpatricktownsend.com

ADAM H. CHARNES
KILPATRICK TOWNSEND
    & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 922-7106
acharnes@kilpatricktownsend.com

*Counsel for Appellant*
*Premera Blue Cross*

TIMOTHY C. HOUPT
PARSONS BEHLE & LATTIMER, P.C.
201 S. Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 536-6750
thoupt@parsonsbehle.com

*Counsel for Appellants*
*Microsoft Corporation and*
*Microsoft Corporation Welfare Plan*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................i

TABLE OF AUTHORITIES .......................................................... iii

INTRODUCTION...........................................................................1

ARGUMENT ..................................................................................2

I.      There is no evidence that Premera violated the Parity Act............2

    A.      The Parity Act regulations do not require that
        inpatient hospice and residential treatment centers be
        treated as analogues. ..............................................................3

    B.      No court has found that hospice is analogous to
        residential treatment centers, other than the district
        court below. ............................................................................6

    C.      Inpatient Hospice is not analogous to residential
        treatment facilities..................................................................9

    D.      Premera's medical necessity requirements for
        residential treatment centers are not more restrictive
        than for inpatient hospice. ....................................................13

        1.      To be covered for either a residential treatment
            center or inpatient hospice benefits, the
            treatment must be the least intensive that will
            meet the patient's needs. ............................................14

        2.      Premera requires that both inpatient hospice and
            residential treatment occur in a licensed facility
            and under the supervision of a physician and
            nurses. ........................................................................16

II.     Premera did not violate ERISA's disclosure statute. ...................18

    A.      The Administrative Services Agreement is not a plan
        document subject to disclosure. ...........................................18

B.    ERISA only required Premera to produce the medical policies or guidelines upon which it relied in deciding the Members' claims. ........................................................... 22

III.    The Parity Act claim alone cannot support an award of fees. ...... 30

CONCLUSION ......................................................................................... 32

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*A.G. ex rel. N.G. v. Cmty. Ins. Co.*,
    363 F. Supp. 3d 834 (S.D. Ohio 2019) .................................... 7

*Aschermann v. Aetna Life Ins. Co.*,
    No. 1:10-cv-00433-LJM-DML, 2010 WL 4778724 (S.D. Ind.
    Nov. 12, 2010), *aff'd*, 689 F.3d 726 (7th Cir. 2012) ............................ 19

*B.D. v. Blue Cross Blue Shield of Ga.*,
    No. 1:16-CV-00099-DN, 2018 WL 671213 (D. Utah Jan. 31,
    2018) .................................................................. 8

*Brown v. Am. Life Holdings, Inc.*,
    190 F.3d 856 (8th Cir. 1999) ....................................... 26, 29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................... 9

*Curtiss-Wright Corp. v. Schoonejongen*,
    514 U.S. 73 (1995) .................................................. 20

*D.K. v. United Behavioral Health*,
    No. 2:17-cv-01328, 2018 WL 5281467 (D. Utah Oct. 24, 2018) ........... 2

*David P. v. United Healthcare Ins. Co.*,
    No. 2:19-CV-00225-JNP-PMW, 2020 WL 607620 (D. Utah
    Feb. 7, 2020) .......................................................... 7

*David S. v. United Healthcare Ins. Co.*,
    No. 2:18-cv-00803-RJS-DAO, 2020 WL 5821203 (D. Utah
    Sept. 30, 2020) ................................................. 7, 8, 29

*Doe v. Travelers Ins. Co.*,
    167 F.3d 53 (1st Cir. 1999) ......................................... 26

*Duncan v. Jack Henry & Associates, Inc.*,
    --- F. Supp. 3d ---, No. 6:21-cv-03280-RK, 2022 WL 2975072
    (W.D. Mo. July 27, 2022) ......................................... 28, 29

*Eilbert v. Pelican*,
  162 F.3d 523 (8th Cir. 1998)............................................................29

*Hardt v. Reliance Standard Life Ins. Co.*,
  560 U.S. 242 (2010)........................................................................31

*Heather E. v. Cal. Physicians' Servs.*,
  No. 2:19-cv-415, 2020 WL 4365500 (D. Utah July 30, 2020).............6

*Howard W. v. Providence Health Plan*,
  --- F. Supp. 3d ---, No. 2:21-CV-01346-JHC, 2023 WL 356585
  (W.D. Wash. Jan. 23, 2023), *appeal filed*, No. 23-35143 (9th
  Cir. Feb. 27, 2023)............................................................................7

*Johnathan Z. v. Oxford Health Plans*,
  No. 2:18-cv-383-JNP-PMW, 2020 WL 607896 (D. Utah Feb.
  7, 2020)..............................................................................................7

*Julie L. v. Excellus Health Plan, Inc.*,
  447 F. Supp. 3d 38 (W.D.N.Y. 2020)................................................15

*Lyn M. v. Premera Blue Cross*,
  966 F.3d 1061 (10th Cir. 2020).........................................................21

*Mathis v. Huff & Puff Trucking, Inc.*,
  787 F.3d 1297 (10th Cir. 2015).........................................................22

*Michael W. v. United Behavioral Health*,
  420 F. Supp. 3d 1207 (D. Utah 2019).................................................8

*Mondry v. Am. Fam. Mut. Ins. Co.*,
  557 F.3d 781 (7th Cir. 2009)......................19, 20, 21, 23, 24, 25, 27, 28

*Murphy v. Verizon Comm'cns, Inc.*,
  587 F. App'x 140 (5th Cir. 2014).......................................................25

*N.F. ex rel. M.R. v. Premera Blue Cross*,
  No. C20-0956-JCC, 2021 WL 4804594 (W.D. Wash. Oct. 14,
  2021), *appeal dismissed*, 2022 WL 16959390 (9th Cir. May
  27, 2022)...........................................................................................13

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ...................................................................... 27

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) ...................................................... 26

*Ruckleshaus v. Sierra Club*,
  463 U.S. 680 (1983) ...................................................................... 31

*Warshauer v. Solis*,
  577 F.3d 1330 (11th Cir. 2009) .................................................... 26

*Wit v. United Behavioral Health*,
  58 F.4th 1080 (9th Cir. 2023) ...................................................... 10

## Statutes and Regulations

29 C.F.R. pt. 2590 ............................................................................ 4
  § 2590.712(c)(2)(ii)(A)(1)–(6) ...................................................... 4
  § 2590.712(d)(3) ............................................................. 23, 26, 27, 28

Final Rules Under the Paul Wellstone and Pete Domenici
  Mental Health Parity and Addiction Equity Act of 2008,
  78 Fed. Reg. 68,240 (Nov. 13, 2013) ........................................ 3, 4, 5, 6

29 U.S.C. § 1024(b)(4) ........................................ 19, 22, 23, 25, 27, 28, 29

## Other Authorities

Wash. State Dep't of Health,
  *Hospice Agencies: Program Overview* .................................................. 9

# **INTRODUCTION**

The Members' brief fails to establish a violation of the Parity Act. They misread the Parity Act regulations; they cite no cases finding inpatient hospice and residential treatment centers analogous after examining the evidence, instead relying exclusively on cases that assumed the truth of allegations in the complaints; and they ignore the fundamental differences between inpatient hospice and residential treatment. The Members also fail to prove that the InterQual Criteria for residential treatment actually are stricter than the limitations applicable to inpatient hospice.

The Members similarly fail to demonstrate that ERISA required Appellants to provide them with copies of the Administrative Services Agreement or InterQual Criteria for *other* services not relevant to their claim. Those are not plan documents, and Premera did not rely on them during the administrative appeal process, so ERISA did not require their disclosure.

# ARGUMENT

## I.    There is no evidence that Premera violated the Parity Act.

Premera uses the InterQual Criteria for medical necessity review of all inpatient facility stays with one exception:  Premera does not apply InterQual Criteria for hospice in any setting.  The Members argue that, if Premera applies InterQual Criteria for any intermediate level mental health facility, it must also apply it to inpatient hospice.[1]

The Members have not met their burden to show that Premera's decision not to apply InterQual Criteria to hospice is a violation of the Parity Act.  They have not provided any evidence for treating hospice as analogous to residential treatment centers and there are many reasons not to do so.  First, the Parity Act regulations do not pair hospice with

---

[1] In the court below, the Members explicitly declined to explain how inpatient hospice and residential treatment facilities are analogous. Supp. App. Vol. I at 35 n.54.  The Members merely asserted that inpatient hospice and residential treatment are analogous, Aplt. App. Vol. I at 166, and cited one case: *D.K. v. United Behavioral Health*, No. 2:17-cv-01328, 2018 WL 5281467 (D. Utah Oct. 24, 2018). But *D.K.* decided a motion to change venue, accepting as true the allegation in the complaint that residential treatment centers and inpatient hospice are analogous.  *Id.* at *1.  The Members now try to argue for the first time that there is support for their position in the regulations interpreting the Parity Act.  This argument was not in the Plaintiffs' summary judgment briefing.

residential treatment centers. Second, no courts, other than the district court below, have found hospice to be analogous to residential treatment centers. Third, the Summary Plan Description, the parties' contract, explicitly provides that inpatient hospice is "short-term" treatment for acute conditions, not for sub-acute conditions such as those treated by residential treatment centers. Fourth, inpatient hospice is a service that can be performed in many types of facilities—from the patient's home to an acute-care hospital—and is not a facility type. Fifth, the service provided in hospice is fundamentally different from that provided in residential treatment centers. Finally, the Members' argument leads to an absurd result and bad public policy.

A. **The Parity Act regulations do not require that inpatient hospice and residential treatment centers be treated as analogues.**

The Members argue that the Parity Act regulation requires that plans treat hospice and residential treatment centers as analogues. They are wrong.

The regulation requires that a plan categorize services as inpatient (in-network or out-of-network), outpatient (in-network or out-of-network), emergency, or prescription drug. *See* Final Rules Under the

Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68,240, 68,241 n.4 (Nov. 13, 2013 (codified at 29 C.F.R. pt. 2590); 29 C.F.R. § 2590.712(c)(2)(ii)(A)(1)–(6). "Comparable" intermediate mental health and medical/surgical benefits must be categorized together. 78 Fed. Reg. at 68,247. The Preamble identifies skilled nursing facilities, rehabilitation hospitals, and residential treatment facilities as comparable care that *must* be categorized together. *Id.* The Preamble also states, as another example, that home health care is comparable to intensive outpatient and partial hospitalization. *Id.*

The regulation does not even mention inpatient hospice, let alone classify it as an analogue to residential treatment centers. *Id.* The three agencies who promulgated the regulation ("Agencies"),[2] of course, were aware of inpatient hospice, but intentionally did not identify it as an analogue to residential treatment facilities. In their commentary, the Agencies compared residential treatment only to skilled nursing facilities and inpatient rehabilitation units. *Id.* at 68,260 (following investigation

---

[2] The Departments of Labor, Health and Human Services, and the Treasury jointly issued the regulations.

of how plans categorize intermediate services, the Agencies found that "residential treatment tends to be categorized in the same way as skilled nursing facility care in the inpatient classification").

When developing the rules for classifying intermediate level care, the Agencies followed existing practices by ERISA plans and their administrators, seeking "to incorporate the principles of parity into existing benefit designs and care management strategies." *Id.* at 68,262. The Agencies did "not expect much change in how most plans consider intermediate behavioral health care in terms of the six existing benefit classifications." *Id.* at 68,260.

The district court opined that the Preamble's list of intermediate level services comparable to residential treatment centers is non-exhaustive.[3] Aplt. App. Vol. 1 at 249. But the Agencies themselves said

---

[3] The district court misinterpreted the Preamble, specifically the "for example" clause. The Preamble states, "[f]or example, if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit." 78 Fed. Reg. at 68,247. In the next sentence it compares home health care, partial hospitalization, and intensive outpatient. *Id.* The clause "for example" is in the singular and references the *comparison* of skilled nursing facilities, rehabilitation hospitals, and residential treatment facilities.

that they investigated how plans classify intermediate level treatment before creating the list.  78 Fed. Reg. at 68,260.  The Agencies were clear that they did not intend for the classifications to be innovative.  *Id.*  And skilled nursing facilities and inpatient rehabilitation units were the only services that the Agencies *required* to be treated as comparable to residential treatment centers.  Even if there are other unlisted facility types that could be comparable to residential treatment centers, there is no basis to conclude that the Agencies intended for hospice, a service that is not like any other treatment, to be one of those.

**B.**   **No court has found that hospice is analogous to residential treatment centers, other than the district court below.**

Addressing Parity Act claims, courts must "identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits." *Heather E. v. Cal. Physicians' Servs.*, No. 2:19-cv-415, 2020 WL 4365500, at *3 (D. Utah July 30, 2020).  Following the categorization in the Preamble, courts consider residential treatment centers, skilled nursing

---

The "for example" clause does not denote that skilled nursing facilities and rehabilitation hospitals are *examples* of comparable services.

facilities, and inpatient rehabilitation units to be analogous. *Howard W. v. Providence Health Plan*, --- F. Supp. 3d ---, No. 2:21-CV-01346-JHC, 2023 WL 356585, at \*13 (W.D. Wash. Jan. 23, 2023) ("The parties agree that skilled nursing facilities and inpatient rehabilitation facilities for medical or surgical care are analogous to residential treatment facilities for mental health care."), *appeal filed*, No. 23-35143 (9th Cir. Feb. 27, 2023); *A.G. ex rel. N.G. v. Cmty. Ins. Co.*, 363 F. Supp. 3d 834, 841 (S.D. Ohio 2019) ("A residential treatment center is an intermediate facility analogue to a rehabilitation hospital and skilled nursing facility.").

Courts have not identified hospice as an analogue to residential treatment centers. The district court relied exclusively on a cluster of District of Utah cases, but none of them actually found that inpatient hospice is analogous to residential treatment. All cases were in a pre-merits posture where the courts were required to accept plaintiffs' allegations as true. *See* Aplt. App. Vol. 1 at 248–49 & n.214 (citing *David S. v. United Healthcare Ins. Co.*, No. 2:18-cv-00803-RJS-DAO, 2020 WL 5821203, at \*5 (D. Utah Sept. 30, 2020) (unpublished); *Johnathan Z. v. Oxford Health Plans*, No. 2:18-cv-383-JNP-PMW, 2020 WL 607896, at \*15 (D. Utah Feb. 7, 2020) (unpublished); *David P. v. United Healthcare*

*Ins. Co.*, No. 2:19-CV-00225-JNP-PMW, 2020 WL 607620, at *17 (D. Utah Feb. 7, 2020) (unpublished); *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1236 n.13 (D. Utah 2019); *B.D. v. Blue Cross Blue Shield of Ga.*, No. 1:16-CV-00099-DN, 2018 WL 671213, at *10 (D. Utah Jan. 31, 2018) (unpublished)).

None of these cases analyzed whether inpatient hospice is analogous to residential treatment, or cited any evidence to support such a finding. *B.D.* found that a contractual exclusion for residential treatment centers violated the Parity Act because the plan covered skilled nursing and rehabilitation hospitals. The court only noted, without analysis, that the plaintiff alleged that residential treatment centers are analogous to skilled nursing facilities, inpatient rehabilitation facilities, and hospice. 2018 WL 671213, at *5. The court did not analyze hospice or decide whether it was analogous to residential treatment because it did not need to. *Id. David S.* involved a discovery dispute in which the court accepted the plaintiffs' allegations as true. 2020 WL 5821203, at *4. The rest of the cases accepted the plaintiffs' allegations as true while denying defendants' motions to dismiss under

Rule 12(b)(6). None of these cases substantively analyzed the hospice issue.

Here, the District Court also accepted the Members' allegations as true, and cited previous Utah cases accepting the plaintiffs' allegations as true. But this case involved cross-motions for summary judgment, and the Members had the burden of proving their allegations with facts. The Members were required to offer evidence to support their claim that inpatient hospice and residential treatments are analogous. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The district court erred by requiring Appellants—not the Members, who bore the burden of proof— to offer evidence regarding classification of inpatient hospice. Aplt. App. Vol. I at 248–49.

## C. Inpatient Hospice is not analogous to residential treatment facilities.

Hospice is not analogous to residential treatment facilities. For starters, "inpatient hospice" is a service, not a facility type, and it can be provided in both intermediate level and hospital facilities. Hospice is typically provided at home, but can also be provided in various inpatient settings, including in skilled nursing facilities, hospice facilities, and hospitals. *See* Wash. State Dep't of Health, *Hospice Agencies: Program*

*Overview*[4] ("Although typically provided in a person's home, hospice care can also be provided in freestanding hospice centers, hospitals, nursing homes and other long-term care facilities."); *see also* Aplt. App. Vol. I at 105 (hospice services "include acute, respite and home care to meet the physical, psychosocial and special needs of the member and their family during the final stages of illness"). It is not correct to compare hospice *services* to *facility types* such as residential treatment centers, skilled nursing centers, and inpatient rehabilitation units.

Moreover, as provided in the Summary Plan Description, inpatient hospice is more intensive than intermediate care; it is akin to hospitalization. *See* Aplt. App. Vol. I at 105–06; *see also Wit v. United Behavioral Health*, 58 F.4th 1080, 1093 (9th Cir. 2023) ("ERISA protects contractually defined benefits."). The Summary Plan Description provides that inpatient hospice is short-term and for acute symptoms: "Short-term care for inpatient hospice services shall be covered when preauthorized." Aplt. App. Vol. I at 106. Inpatient hospice is therefore

---

[4] https://doh.wa.gov/licenses-permits-and-certificates/facilities-z/hospice-agencies/about-hospice

not analogous to the long-term "sub-acute inpatient" residential treatment for which the Members sought coverage here. *Id.* at 21, ¶ 6.

Hospice is also not comparable to residential treatment centers because it is for individuals who are actively dying and who will never recover. *Id.* at 108. The hospice setting involves an entirely different type of care—palliative care that brings a patient comfort in her final moments. *Id.* Hospice does not treat the patient's medical condition or attempt to restore the patient's health; indeed, treatment of medical conditions ceases upon entry to hospice. *Id.*

The reasons for applying the InterQual Criteria for other services are not present with hospice. Hospice is a setting in which constant re-evaluation of the appropriateness of the care is unnecessary: once a doctor determines that a patient will die and hospice is appropriate, efforts to cure the patient's disease end. There is little risk of over-utilization or patient harm from hospice services, and no need for Premera to intrude into the member's last moments. There is little (if any) value in requiring providers or family members to submit medical records demonstrating that the patient is actually dying, because that condition typically does not change. In contrast, residential treatment

11

centers treat patients with the goal of improving the patient's condition sufficiently to allow her to leave residential treatment. *See* Aplt. App. Vol. III at 498–10. Every patient in residential treatment will leave the facility at some point, and overutilization and inappropriate continuation of care in such a facility is an ever-present risk—a risk that can cause great unnecessary expense for the health-care system and harmful care for the patient.

The Members ask this Court to wear blinders, ignoring the profound differences between residential treatment centers and inpatient hospice. Nothing in the Parity Act mandates that courts ignore the differences between mental health and medical/surgical treatments in determining whether they are analogous or there is a lack of parity between them.

The Members' argument, if accepted, would lead to the absurd result of plans adding unnecessary medical necessity criteria to hospice services in order to create "parity" with residential treatment centers. Contrary to the Members' argument (Br. 22), it would be more feasible for plans to require use of the InterQual Criteria for hospice services than to eliminate the criteria for residential treatment centers, given the high

risk of improper utilization of residential treatment centers. This result is bad public policy and cannot be what Congress intended.

### D. Premera's medical necessity requirements for residential treatment centers are not more restrictive than for inpatient hospice.

Alternatively, Premera did not violate the Parity Act because there is no evidence that Premera's requirements for residential treatment centers are more restrictive than for inpatient hospice. To the contrary, the Summary Plan Description requires that both residential treatment centers and inpatient hospice be the least intensive treatment that will meet the patient's needs and that treatment occur in a licensed facility and under the supervision of a physician and nurses.

The InterQual Criteria for residential treatment centers do not impose *additional* requirements, on top of those in the Summary Plan Description. Instead, the InterQual Criteria simply provide more specific guidance in the context of residential treatment centers. *See, e.g., N.F. ex rel. M.R. v. Premera Blue Cross*, No. C20-0956-JCC, 2021 WL 4804594, at *4 (W.D. Wash. Oct. 14, 2021) ("While InterQual's criteria are certainly more specific than the plan, the Court does not find them to be more

stringent."), *appeal dismissed*, 2022 WL 16959390 (9th Cir. May 27, 2022).

> **1.   To be covered for either a residential treatment center or inpatient hospice benefits, the treatment must be the least intensive that will meet the patient's needs.**

Both the InterQual Criteria and the Summary Plan Description ultimately require the same thing—that the patient receive the least intensive treatment that will meet the patient's needs.  The InterQual Criteria merely provide guidance on how to do that analysis in the context of residential treatment centers.

The Summary Plan Description requires all services will only be covered when they cannot be done in a less intensive setting.  Aplt. App. Vol. I at 111–12.  This applies to all benefits, including inpatient hospice.

The InterQual Criteria impose the same requirements.  They likewise require the least intensive service required to meet the patient's needs:

> The residential treatment center criteria is used for a patient who has been admitted or is expected to be admitted to a psychiatric residential treatment center.  There is lack of evidence to support the effectiveness of this level of treatment over less restrictive levels of care for individuals with a viable living environment, therefore it is only recommended in cases where an individual cannot be managed safely in the

> community yet doesn't require the services of an inpatient
> hospitalization.

Aplt. App. Vol. III at 503; *see also Julie L. v. Excellus Health Plan, Inc.*,
447 F. Supp. 3d 38, 55 (W.D.N.Y. 2020) (holding that the InterQual
Criteria "are consistent with the Plan's basic requirement that inpatient
services are covered only where treatment in a less intensive setting
would not be effective").

Thus, the InterQual Criteria were not an extra hurdle for the
Members to clear.  The Summary Plan Description requires that both
residential treatment centers and inpatient hospice be the least intensive
treatment that will meet the patient's needs without regard to the
InterQual Criteria.

Indeed, the district court essentially confirmed this conclusion.  The
court found that the claim was not medically necessary without reference
to InterQual:  "residential treatment care was not deemed medically
necessary under the Plan's terms, even without application of the
InterQual Criteria." Aplt. App. Vol. III at 303, 308–09.  This conclusion
confirmed that the Plan and the Criteria imposed the same
requirements.

### 2. Premera requires that both inpatient hospice and residential treatment occur in a licensed facility and under the supervision of a physician and nurses.

C.S.'s stay at Daniels Academy also was not medically necessary because he did not receive the medical treatment required for a residential treatment benefit. The Summary Plan Description imposes the same treatment requirements for hospice.

The Members' claim did not satisfy the InterQual Criteria because C.S.'s treatment at Daniels Academy did not occur under the supervision of a psychiatrist and other appropriate licensed professionals. Aplt. App. Vol. I at 219–20. The Summary Plan Description applied the same requirement. *Id.* at 240 ("The Family argues C.S.'s treatment at Daniels Academy was a covered benefit because it was 'medically necessary' as defined by the Plan language and under the relevant InterQual Criteria. The court disagrees and concludes this argument is not supported by a preponderance of the evidence."); *see also* Aplt. App. Vol. II at 303.

The Summary Plan Description imposes similar treatment requirements for inpatient hospice as do the InterQual Criteria for residential treatment centers. Premera explained that C.S.'s stay at

Daniels Academy did not meet the following InterQual Criteria for

residential treatment centers:

> The treatment guidelines we use also state that, in addition
> to other requirements, residential treatment for a mental
> health condition is medically necessary only when:
>     • A psychiatric evaluation is done within one business
> day of admission, and then (add when necessary: by a
> psychiatrist) [sic] at least one time per week.
>     • A psychosocial evaluation is done within 48 hours of
> admission.
>     • A substance use evaluation is done within 48 hours of
> admission.
>     • Clinical assessment by a licensed provider is done at
> least one time per day.
>     • You receive individual or group or family therapy at
> least three times per week.

Aplt. App. Vol. I at 219–20.

For hospice, the Summary Plan Description requires that services

be provided through a "state-licensed hospice or other hospice program

that meets the standards of the National Hospice and Palliative Care

Organization," and that such services "must be part of a written

treatment plan prescribed by a licensed physician." *Id.* at 107. The

physician must certify that the patient is dying and provide continuous

treatment. *Id.* at 106–08. The Summary Plan Description further

provides that hospice care is available for "a terminally ill member to

remain at home or to use the services of a hospice center instead of using

17

hospital inpatient services." *Id.* at 107.  The Summary Plan Description defines hospice care as "a coordinated program of palliative and supportive care for dying members by an interdisciplinary team of professionals and volunteers centering primarily in the member's home." *Id.* at 108.  The Summary Plan Description requires that both residential treatment and hospice occur under the supervision of a physician and the physician's team of professionals.  There is parity for this reason as well.

## II.    Premera did not violate ERISA's disclosure statute.

### A.    The Administrative Services Agreement is not a plan document subject to disclosure.

The Administrative Services Agreement is a contract between Premera and Microsoft primarily intended to memorialize the amount Microsoft pays Premera to administer the plan and the services Microsoft purchased from Premera.  The Plan's Members are not parties to the Agreement.  ERISA requires that all relevant plan information be stated in the Plan itself and the Summary Plan Description, so the Administrative Services Agreement does not and could not depart from the governing plan documents.

The district court concluded that the Administrative Services Agreement is a plan document because the Members could have learned

information from it.  But any information useful to members was also disclosed in the Summary Plan Description, the document intended for members.  In fact, the Members do not allege that the Administrative Services Agreement contained any information relevant to members that was not in the Summary Plan Description.

The Members do not challenge the extensive precedent holding that administrative services agreements between plans and third-party administrators are not plan documents, and therefore 29 U.S.C. § 1024(b)(4) does not require the plan to produce it.  Appellants' Br. 37–41.

The parties agree that there are only two exceptions where 29 U.S.C. § 1024(b)(4) requires a Plan to produce an Administrative Services Agreement, and the district court relied on one of them: "[w]here the administration of a plan is divided" between the employer and the third-party administrator.  Aplt. App. Vol. I at 256 (quoting *Mondry v. Am. Fam. Mut. Ins. Co.*, 557 F.3d 781, 796 (7th Cir. 2009)).[5]  Here, there is no

---

[5] It is uncontroverted that the second exception—where the plan is insured and the Administrative Services Agreement is also the insurance policy containing the terms of coverage—does not apply.  *See Aschermann v. Aetna Life Ins. Co.*, No. 1:10-cv-00433-LJM-DML, 2010 WL 4778724,

dispute that administration was not divided, and the Members do not challenge that the district court's reliance on *Mondry* was error because Premera is the only third-party administrator for the Plan. *See* Appellants' Br. 42; Members' Br. 29–30.

The Members' only argument is that the district court found that the Administrative Services Agreement contained some information also found in the Summary Plan Description, such as "where to send claims, which party … to request plan documents from, and other information necessary to make informed decisions under the Plan," and because it repeats this information, it becomes a Plan document. Members' Br. 29–30 (citing Aplt. App. Vol. I at 262). But this information was in the Summary Plan Description, where ERISA required it to be disclosed. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995).

As support for its conclusion that Appellants had to produce the Administrative Services Agreement, the district court quoted the part of the Summary Plan Description that explicitly notified the Members about the division of authority between Premera and Microsoft that the

at \*3 (S.D. Ind. Nov. 12, 2010), *aff'd*, 689 F.3d 726 (7th Cir. 2012). Here, the Plan is self-insured.

district court assumed was also in the Administrative Services Agreement. *See* Aplt. App. Vol. I at 258 n.262 (citing Dkt. No. 58 at 17–18); *see also id.* at 94. This is ironic because this was the very information that the court in *Mondry* held that the plaintiffs had to learn from the Administrative Services Agreement because it was not in the Summary Plan Description. *Mondry*, 557 F.3d at 796. Appellants were required to disclose this information to the Members and did so in the Summary Plan Description. *See Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1067 (10th Cir. 2020) (the "summary plan description" is what "members would ordinarily regard as their primary source of information about the plan").

Moreover, the district court could not have made any finding regarding what information the Administrative Services Agreement may have provided because it did not know the Agreement's contents. Aplt. App. Vol. I at 253 ("Defendants have never produced the ASA."). The district court made *assumptions* about what the Administrative Services Agreement included without having read it. *Id.* at 262. The Members did not request or move to compel production of the Administrative Services Agreement during the litigation, nor did the district court find

that Premera violated its discovery obligations in failing to produce it.
*See id.* at 38–51, 113–31, 253.  Because the district court did not review
it, the court had no basis to conclude that "the administrative services
agreement affected Plaintiffs' rights and obligations including 'where to
send claims, which party … to request plan documents from, and other
information necessary to make informed decisions under the Plan.'"
Members' Br. 29–30 (quoting Aplt. App. Vol. I at 262).  That finding must
be disregarded.  *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297,
1305 (10th Cir. 2015).

> **B.     ERISA only required Premera to produce the medical
> policies or guidelines upon which it relied in deciding
> the Members' claims.**

It is undisputed that during the Members' appeal, Premera
produced all guidelines relied on in deciding their claim.  The Members
defend the district court's holding that Premera was also required to
produce InterQual Criteria for *other* medical services—services that C.S.
did not receive, and guidelines on which Premera did not rely.

The issue is whether the catch-all provision of 29 U.S.C.
§ 1024(b)(4) requires production before litigation of medical policies for
unrelated services.  The catch-all provision requires production of "other

instruments under which the plan is established or operated." *Mondry*, 557 F.3d at 792–93 (quoting 29 U.S.C. § 1024(b)(4)). No medical policy could be a document under which the plan is *established*, such as a governing plan document. The cases unanimously hold that a medical policy is not an instrument under which the plan is *operated* unless the administrator relies on it in deciding the ERISA claim. *E.g.*, *id.* at 801 ("[W]hen a claims administrator expressly cites an internal document and treats that document as the equivalent of plan language in ruling on a participant's entitlement to benefits, the administrator renders that document one that in effect governs the operation of the plan for purposes of section 1024(b)(4), and production of that document is required.").

The Members do not dispute this unanimous authority. But they, like the district court, cite a disclosure regulation, 29 C.F.R. § 2590.712(d)(3). The regulation requires disclosure of "criteria for both medical/surgical benefits and mental health and substance use disorder benefits." *See* Members' Br. 31.

But the Members and the district court ignored the context of the disclosure provision. "The purpose of this disclosure provision is to 'ensure[] that "the individual participant knows exactly where he stands

with respect to the plan.""" *Mondry*, 557 F.3d at 793 (brackets in the

original).  More specifically:

> Knowing where one stands with respect to a plan includes
> having the information necessary to determine one's
> eligibility for benefits under the plan, to understand one's
> rights under the plan, to identify the persons to whom
> management of plan funds has been entrusted, and to
> ascertain the procedures one must follow in order to obtain
> benefits.

*Id.* (citations omitted).  In short, Congress aimed ERISA's disclosure

requirements at providing members sufficient information to seek

benefits under the plan.

Requiring disclosure of medical policies for treatments not provided

to the member and for which benefits cannot be sought does not further

Congress's policy goal.  C.S. did not receive skilled nursing or inpatient

rehabilitation, so the InterQual Criteria for those services are completely

irrelevant to the Members' claim for benefits.  To be sure, they may be

relevant to their Parity Act claim, but they asserted that claim *later*, in

court, and not during the administrative appeals.  Once asserted, they

could—and did—obtain the criteria through ordinary discovery

procedures.  But during the administrative process Premera was

required to produce only documents related to the claimed benefits.

24

The practical consequences of the rule adopted by the district court are far reaching. If affirmed, any participant who challenges the denial of a claim for one service can demand medical policies related to every other service covered by the plan—which could amount to dozens or hundreds of medical policies and other documents. Such policies would be of no practical use to members—after all, they could not use them during the administrative appeals—but producing them would impose substantial costs on the plan administrator, which ultimately would be passed onto employers or members.

As noted above, the extensive case law uniformly holds that Premera was only required to produce medical policies upon which it relied in deciding Plaintiffs' ERISA benefits claim. *E.g., id.* at 801 ("[W]hen a claims administrator expressly cites an internal document and treats that document as the equivalent of plan language in ruling on a participant's entitlement to benefits, the administrator renders that document one that in effect governs the operation of the plan for purposes of section 1024(b)(4), and production of that document is required"); *Murphy v. Verizon Comm'cns, Inc.*, 587 F. App'x 140, 144 (5th Cir. 2014) ("We agree with the majority of the circuits which have construed [29

U.S.C. § 1024(b)(4)'s] catch-all provision narrowly so as to apply only to formal legal documents that govern a plan."); *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 861–62 (8th Cir. 1999) (construing "other instruments" as meaning "not any document[s] relating to a plan, but only formal documents that establish or govern the plan"); *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 60 (1st Cir. 1999) (holding that mental health guidelines were not "'other instruments,' a phrase that in context refers to the formal legal documents that underpin the plan" because the plan administrator "was not bound to use them, nor did patients have any legal rights under them.").

Further, 29 C.F.R. § 2590.712(d)(3) does not support the Members' argument. As an interpretive rule, it "simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.'" *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009); *see also Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) ("As to interpretive rules, an agency action that merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties, is an interpretive rule."). The regulation therefore must, if

possible, be reconciled with existing case law. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Courts have held that 29 U.S.C. § 1024(b)(4) unambiguously requires that only guidelines upon which the plan relied in deciding claims are documents under which the plan was operated. *Mondry,* 557 F.3d at 797 ("We agree with our sister circuits that the latter interpretation [*i.e.*, that a claimant has a right to documents other than those upon which the plan relied in deciding the claim] would make hash out of the statutory language, which on its face refers to a specific set of documents: those under which a plan is established or operated. If it had meant to require production of all documents relevant to a plan, Congress could have said so.") (citation omitted). The holdings of *Mondry* and other cases therefore effectively trump any reading of 29 C.F.R. § 2590.712(d)(3) that conflicts with those opinions. *See Nat'l Cable*, 545 U.S. at 982.

As noted above, extending 29 C.F.R. § 2590.712(d)(3) to documents related to *other services* and that were not relied on during review of the claim does not comport with the purpose for the disclosure requirement. Like the statute, the regulation should apply only "when a claims administrator expressly cites an internal document and treats that

document as the equivalent of plan language in ruling on a participant's entitlement to benefits." *Mondry,* 557 F.3d at 801.  Accordingly, if the plan decides a Parity Act objection during the administrative appeals process, 29 C.F.R. § 2590.712(d)(3) requires disclosure of requested medical policies for other services.  But otherwise such documents may only be obtained in discovery during subsequent Parity Act litigation.  "If it had meant to require production of all documents relevant to a plan, Congress could have said so." *Mondry,* 557 F.3d at 797.

In *Duncan v. Jack Henry & Associates, Inc.*, --- F. Supp. 3d ---, No. 6:21-cv-03280-RK, 2022 WL 2975072 (W.D. Mo. July 27, 2022), the court decided the very issue here before this Court.  The court held that 29 C.F.R. § 2590.712(d)(3) does not displace judicial interpretations of 29 U.S.C. § 1024(b)(4)'s "other instruments under which the plan is established or operated" language.  2022 WL 2975072, at *25.  Therefore, the court held, 29 U.S.C. § 1024(b)(4) does not require production of documents relevant to Parity Act claims not relied upon by a plan in adjudicating the plaintiffs' claims.  *Id.* at *28.  The court held that 29 C.F.R. § 2590.712(d)(3) did not abrogate an Eighth Circuit decision

holding that a plan only needs to produce medical policies relied on in deciding the claim:

> In *Brown*, the Eighth Circuit held that the otherwise undefined "other instruments" clause of § 1024(b)(4) means "formal documents that establish or govern the plan," based upon the "ordinary meaning" of the term "instrument" in conjunction with the phrase "under which," and that the terms "should also be read consistently with the more specific terms that precede it." 190 F.3d at 861 (citing *Eilbert v. Pelican*, 162 F.3d 523, 527 (8th Cir. 1998)). In *Eilbert*, on which the *Brown* court explicitly cited in interpreting § 1024(b)(4), the Eighth Circuit employed the "interpretive canons *noscitur a sociis* (a term is known from its associates) and *ejusdem generis* (general words in an enumeration are construed as similar to more specific words in the enumeration) in interpreting a state statute. 162 F.3d at 527 (citation omitted). Additionally, the *Brown* court cited a number of earlier decisions from its sister circuit courts of appeal similarly interpreting § 1024(b)(4)'s "other instruments" clause narrowly with the same familiar canons of statutory interpretation. *See* 190 F.3d at 861.

*Id.* at *27.

Premera did not decide the Members' Parity Act claim during the Members' appeal of benefits, nor was it required to because a parity cause of action alleges a statutory violation of ERISA itself; it does not arise from an alleged violation of rights under an ERISA plan. *David S.*, 2020 WL 5821203, at *2. Thus, Premera did not violate ERISA's disclosure obligations by not producing the InterQual Criteria for skilled nursing

and inpatient rehabilitation services during the administrative appeal process.

## III.  The Parity Act claim alone cannot support an award of fees.

If this Court reverses the statutory penalties but affirms the Parity Act violation, it should reverse the award of attorney's fees.  As Appellants explained, the district court ultimately denied the Members' claim for benefits and awarded them no relief on their Parity Act claim, so they did not obtain "some success on the merits."

In responding to this argument, the Members mostly argue for waiver.  First, they contend that the Court should "decline to review" Appellants' argument because they omitted certain documents from the appendix, so the appendix was not "sufficient for this Court's review." Members' Br. 34 n.2.  This is a curious argument, because their brief does not cite any of the documents that they complain Appellants improperly omitted in asserting their substantive entitlement to fees.  This confirms Appellants' determination that they were not relevant to the appeal.  In any event, the Members suffered no prejudice from any oversight. Finding waiver in such circumstances would be inequitable.

Second, the Members contend that Appellants waived any opposition to their fee request by not opposing it in the district court. This argument, however, ignores *when* Appellants took that position. At the time of the Members' fee application, the district court had found both a Parity Act violation and a disclosure violation. It was then impossible for Appellants to make the argument they now assert: first, the court found a disclosure violation and, second, the court had not yet denied a remedy for the Parity Act violation. Even after the remedy holding later, the disclosure violation was sufficient to support a fee award. Indeed, Appellants explicitly "reserve[d] their rights to appeal the underlying orders and therefore on that basis to appeal the award of fees and costs or interest." Dkt. No. 105 at 2. This is all Appellants are doing now.

On the merits, the Members address this Court's five-factor standard for the award of ERISA fees. Members' Br. 39–41. Before that standard applies, however, they must demonstrate that they achieved "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (quoting *Ruckleshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)). The Members never explain what success they

31

achieved on their Parity Act claim—and they achieved none, having received no relief from the district court.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

s/ *Gwendolyn C. Payton*

GWENDOLYN C. PAYTON
JOHN R. NEELEMAN
KILPATRICK TOWNSEND
   & STOCKTON LLP
1420 5th Avenue, Suite 3700
Seattle, Washington 98101
Telephone:    (206) 467-9600
gpayton@kilpatricktownsend.com
jneeleman@kilpatricktownsend.com

ADAM H. CHARNES
KILPATRICK TOWNSEND
   & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 922-7106
acharnes@kilpatricktownsend.com

*Counsel for Appellant Premera*
*Blue Cross*

s/ *Timothy C. Houpt*

TIMOTHY C. HOUPT
PARSONS BEHLE & LATTIMER,
P.C.
201 S. Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 536-6750
thoupt@parsonsbehle.com

*Counsel for Appellants*
*Microsoft Corporation and*
*Microsoft Corporation Welfare*
*Plan*

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cisco Secure Endpoint, Version 8.1.5.21322, last updated 03/27/2023 and according to the program are free of viruses.

<u>s/ *Gwendolyn Payton*</u>
KILPATRICK TOWNSEND
   & STOCKTON LLP
1420 5th Avenue, Suite 3700
Seattle, Washington 98101
Telephone: (206) 467-9600
gpayton@kilpatricktownsend.com

*Counsel for Appellant Premera Blue Cross*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,186 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using MS Word 365 in Century Schoolbook 14-point font.

3.    This brief complies with the requirements of Tenth Circuit Rules because the brief has been scanned for viruses and is virus-free.

DATED: April 12, 2023.

<div style="margin-left: 40%;">

s/ *Gwendolyn Payton*

KILPATRICK TOWNSEND
    & STOCKTON LLP
1420 5th Avenue, Suite 3700
Seattle, Washington 98101
Telephone: (206) 467-9600
gpayton@kilpatricktownsend.com

*Counsel for Appellant Premera Blue Cross*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 12, 2023, I electronically filed the foregoing **REPLY BRIEF OF APPELLANTS PREMERA BLUE CROSS, MICROSOFT CORPORATION, AND MICROSOFT CORPORATION WELFARE PLAN** with the Clerk of Court using the CM/ECF System, which will send notification of such filing to the following:

Brian S. King  
Nediha Hadzikadunic  
BRIAN S. KING, PC  
420 E. South Temple  
Suite 420  
Salt Lake City, UT 84111  
brian@briansking.com  

*Counsel for Appellees  
M. S., L. S., and C. J. S.*

Timothy C. Houpt  
PARSONS BEHLE & LATTIMER, P.C.  
201 S. Main St., Suite 1800  
Salt Lake City, Utah 84111  
Telephone: (801) 536-6750  
thoupt@parsonsbehle.com  

*Counsel for Appellants  
Microsoft Corporation  
and the Microsoft  
Corporation Welfare Plan*

s/ *Gwendolyn Payton*  
KILPATRICK TOWNSEND  
   & STOCKTON LLP  
1420 5th Avenue, Suite 3700  
Seattle, Washington 98101  
Telephone: (206) 467-9600  
gpayton@kilpatricktownsend.com  

*Counsel for Appellant Premera Blue  
Cross*